Filed 9/12/24  In re A.D. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083647 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J289098, J289099 & J292442) |
| v. | OPINION |
| C.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven Mapes, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant C.G.

Shobita Misra, under appointment by the Court of Appeal, for Defendant and Appellant J.D.

1

Tom Bunton, County Counsel, Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendants and appellants, C.G. (Mother) and J.D. (Father), appeal from the juvenile court's order under Welfare and Institutions Code[1] section 366.26 terminating their parental rights to their three minor daughters. They argue the juvenile court erred in finding the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i) did not apply. (See *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).) We disagree and affirm the order terminating parental rights.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father are the parents of three girls: Y.A.D.G.O. (Y.) (born April 2017); A.C.D.G.O. (A.) (born September 2018); and M.D.G.O. (M.) (born March 2022 during these dependency proceedings). Then four-year-old Y. and two-year-old A. came to the attention of plaintiff and respondent, the San Bernardino County Department of Children and Family Services (CFS) in response to an emergency referral generated by law enforcement on May 4, 2021. Law enforcement reported the parents were residing in a hotel room when Mother and Father got into a physical altercation. Father grabbed

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

Mother, put her in a bear hug position, and bit her on the face. In response, Mother fought back and bit Father, causing her to sustain a cut on her lip. Mother contacted law enforcement, but Father left the scene before officers arrived. After consulting CFS, a detention warrant was obtained and Y. and A. were taken into protective custody.

On May 6, 2021, CFS filed petitions on behalf of Y. and A. pursuant to section 300, subdivision (b) (failure to protect) based on the parents history of domestic violence and substance abuse, and the parents exposing the girls to incidents of domestic violence. The girls were formally detained the following day at the May 7, 2021, detention hearing. The parents were provided with supervised visits and services pending the jurisdictional/dispositional hearing.

CFS's investigation revealed that Mother had a current restraining order against Father based on a history of domestic violence between the parents. Father was recently in jail due to a domestic violence incident between the parents in which Father had spat in Mother's face. Upon his release, Mother and the maternal grandmother (MGM) picked him up from jail and took him to MGM's home. However, MGM and the other occupants in her home did not want Mother to live there any longer and kicked her out of the house. The parents thereafter went to a hotel where they again commenced in domestic violence.

When the social worker spoke to Mother about the allegations in the petitions, Mother appeared to be under the influence of illicit substances or alcohol. She was sweaty and unable to maintain eye contact. She also slurred her speech and had difficulty

3

answering CFS's questions. Mother confirmed a history of methamphetamine and marijuana use but denied any alcohol use. When questioned about the parent's recent domestic violence incident, Mother stated Father had expressed a desire to be intimate, but when she refused, Father started acting weird, jumped on top of her, and bit her face. The children were asleep at the time, but they woke up and saw Mother attempting to defend herself. The children wanted Father to get off Mother and started crying. After the children started crying, Father left the hotel room and Mother contacted law enforcement for assistance. Mother refused to file a police report or put protective measures in place for herself and the children.

Mother confirmed the parents had a history of domestic violence in which both she and the father were aggressors on different occasions. Mother reported that she was arrested for domestic violence on April 18, 2021, and was on summary probation for 36 months. Consequently, a restraining order was issued against her that prevented her from being near Father. Nevertheless, Mother admitted that she stayed in contact with Father, despite the abuse, because she wanted the children to have a father in their lives. Mother explained that there have been approximately five incidents of domestic violence over the course of their relationship that resulted in injuries that were caused by Father. She reported that she had sustained a broken nose, bruised eye, and several marks and bruises all over her body. As CFS assessed the safety of the children, an unidentified man was observed sitting on the couch, tying his shoes, as if he were preparing to leave. CFS asked Mother who the unidentified man was, but Mother was hesitant to respond. The

4

man reported he was a maternal cousin; however, his identity could not be confirmed with photo identification. CFS suspected the man was the father of the children. Mother claimed she did not have any contact information for Father when CFS inquired about his whereabouts.

MGM reported that Mother was kicked out of her home due to Mother being argumentative and often picking fights with the other occupants in the home. MGM expressed concern for Y. and A. given the parent's drug use, transient lifestyle, and unemployment. She did not believe the children should live with the parents and did not know how Mother would provide for the children's needs.

Mother and Father also have a history with child protective services, commencing in January 2019, for general neglect due to the parents' issues with substance abuse and domestic violence. Mother has a criminal history of shoplifting, domestic battery, and brandishing a weapon. Father has a lengthy criminal history of theft and drug-related offenses. CFS provided Mother and Father with referrals for services, including parenting classes and substance abuse treatment. Father reported that he was taking drug treatment classes, parenting classes, and anger management classes. Father, however, had not drug tested and had been a no-show to each drug test. Mother tested positive for amphetamines on May 7, 2021, and then did not participate in further drug testing.

The jurisdictional/dispositional hearing was held on July 15, 2021. Neither Mother nor Father were present. The juvenile court found true the allegations in the petition and declared the children dependents of the court. The parents were provided

with reunification services. The children's counsel requested CFS have authority to facilitate a psychological evaluation for Mother. The juvenile court granted the request.

By the six-month review hearing in January 2022, CFS recommended continued reunification services for the parents. Mother was living with MGM and reported that she was working. She was 24 weeks pregnant and noted Father was the father of her unborn child but did not know his whereabouts. Mother also stated that she was diagnosed with depression. The parents were referred to individual counseling, a parenting education program, an outpatient drug treatment program, random drug testing, and a domestic violence program, but failed to make progress on their case plan services and failed to randomly drug test. Mother missed 10 drug tests, and Father missed eight. Mother continued to visit the children weekly but was inconsistent in attending visits at times. Father did not visit the children during this reporting period, and had not made any attempt to contact the children since June 11, 2021. His whereabouts remained unknown.

On March 11, 2022, CFS filed a petition on behalf of M., the girls newborn sibling, pursuant to section 300, subdivisions (b) (failure to protect), (g) (no provision for support) and (j) (abuse of sibling). M.O. was formally detained on March 14, 2022.

When Mother gave birth to M., she was in reunification services with Y. and A. CFS, however, planned to recommend the termination of those services. There was no information regarding Father's participation or completion of services. Mother continued to minimize CFS's involvement and did not complete any of her case plan. She failed to

drug test consistently and reported that she was unable to test because she was still using methamphetamine and marijuana. Mother denied that her substance abuse impaired her ability to provide adequate care and supervision to M. Mother had enrolled into a drug program through Clare Matrix in August 2021. She was participating in the program via Zoom for about one month and only missed two classes. However, Mother was terminated from the program soon thereafter at the end of August 2021. Mother reported she continued to use marijuana and methamphetamine until October 2021. She stated she stopped using when she found out she was pregnant but also reported that she stopped using when she was four months pregnant.

Mother denied that she engaged in domestic violence, but agreed Father engaged in domestic violence that placed M. at substantial risk of physical and emotional harm. Yet, Mother reported they were both aggressors when she was in a relationship with Father. Mother believed the violence began two years ago when Father started using drugs. She did not know if Father continued to use substances because she was unaware of his whereabouts. Mother was inconsistent in her report of when she last had contact with Father. It was assumed Mother had contact with Father, for the last time, nine months prior to the date she gave birth to M. However, Mother later reported she had contact with Father approximately one month ago when he called her from the Los Angeles County jail.

When Father was subsequently located, he reported that he was incarcerated, and had not been around the children. Father explained that he was arrested on a felony

robbery charge in Los Angeles in November 2021 but was released on bail. He was arrested once again on February 25, 2022, and had been incarcerated for six months on the felony robbery charge. Father stated he had not been in his girls lives for over a year. He claimed his current goal was to rehabilitate himself while he was incarcerated. Due to his incarceration, Father reported he had been sober for about one year.

On August 24, 2022, the juvenile court found true the allegations in M.'s section 300 petition and declared the child a dependent of the court. Mother was provided with reunification services, however, the juvenile court denied services to Father pursuant to section 361.5, subdivision (b)(12).

On May 20, 2022, MGM filed a section 388 petition, requesting the children be placed in her home.

On June 30, 2022, Mother filed a section 388 petition to change the previous court orders of July 15, 2021, and March 14, 2022. On those dates, the juvenile court ordered placement of Y., A., and M. in the foster home of Ms. G. Mother alleged there was a change in circumstance surrounding the foster parent's unwillingness to support reunification services and eventual return to Mother. Based on this changed circumstance, Mother requested a new order removing the children from the foster home of Ms. G. and placing the children in the home of MGM. Mother alleged the proposed order would be better for the children because their current placement did not support the goal of reunification with Mother.

CFS recommended the court deny the section 388 petitions because a placement change would be detrimental to the well-being of the children, as they had built a strong bond and connection with their caregiver, Ms. G. Ms. G. believed the children should not be moved into MGM's home because she believed Mother would have unsupervised access to the girls.

As of August 16, 2022, Mother's visits with the children transitioned to unsupervised. Mother had completed a parenting education program and a domestic violence program. She had also completed an outpatient drug program and individual counseling. At that time, Mother was appropriate and demonstrated parental capacity.

On August 24, 2022, the juvenile court held the six-month review hearing in Y. and A.'s case. CFS recommended continued services for Mother with an order of unsupervised visitation and termination of Father's services. Based on her progress and CFS's recommendation, Mother withdrew her section 388 petition filed June 30, 2022. The juvenile court adopted the CFS's recommendations, provided Mother with additional services, and terminated Father's services. Father was provided with supervised letter contact and supervised visitation once a month with Y. and A.

Mother was granted a 29-day visit on March 23, 2023. Mother continued to work full time and MGM assisted her with childcare. A new referral, however, was generated on March 29, 2023, due to one of her older sister's stating Mother's boyfriend had pushed Mother. CFS recommended the return of M. to MGM and continued services for Mother.

9

The six-month review hearing in M.'s case was held on April 20, 2023. The juvenile court provided Mother with additional services, as well as unsupervised visitation once a week for eight hours. M. was later returned to Mother's custody on April 26, 2023.

On April 28, 2023, the juvenile court held a post permanency review hearing in Y. and A.'s case. CFS recommended return of the children to Mother with family maintenance services. The children's counsel submitted on CFS's recommendation on the condition Mother lived in MGM's home with the children. The juvenile court granted the request and ordered Y. and A. returned to Mother's custody with family maintenance services on the condition Mother reside with MGM.

Unfortunately, Mother was unable to maintain her sobriety. Approximately three months later, on July 3, 2023, CFS filed a section 387 supplemental petition, alleging the prior disposition was ineffective in the protection or rehabilitation of the children. CFS alleged Mother was unable to provide food, clothing, and shelter for the children based upon an incident that took place on or around June 26, 2023. MGM reported Mother appeared to be under the influence on several occasions and would leave home for several days without telling her where she was going. On one occasion, Mother was under the influence and wanted to take the children with her. MGM did not allow Mother to take the children and called law enforcement for assistance.

On another occasion, on June 26, Mother left the home for a job interview but did not return home until 10 p.m. When she entered the home, she appeared to be under the

influence of substances, so MGM did not allow Mother to enter the home. MGM

explained that she did not want the children to see Mother under the influence. Later that

night, MGM received a telephone call from another resident of the apartment complex

informing her that Mother was having trouble getting into the front gate of MGM's

apartment building. When MGM and a maternal aunt checked on Mother, she had glossy

eyes, and was unable to walk. Mother was later admitted to the hospital where doctors

stated Mother was under the influence of substances. CFS thus recommended removal of

all three girls from Mother's custody with continued placement with MGM.

The juvenile court formally detained the children and maintained them in MGM's

home on July 3, 2023.

CFS's investigation revealed Mother continually left the children in MGM's home

without making a plan for the children's care. Mother would be away for several days

and continued to have a relationship with Father. In addition, Mother allowed the

children to have unauthorized contact with Father. MGM confirmed that Mother was

recently seen with Father, who had picked up her and the children in his car. CFS

attempted to speak to Mother about the importance of following court orders and her case

plan, but Mother was not honest and did not take accountability for her actions.

The maternal aunt, who also lived in the home with MGM, confirmed that police

had to be called on May 28, 2023, due to Mother appearing to be under the influence and

attempting to take the children with her. She also confirmed she saw Father that day

when Mother was trying to take the children. The maternal aunt further confirmed that

11

on June 27, 2023, Mother arrived at MGM's home under the influence and that later that night she and MGM found Mother outside the apartment building with a bruise on her face. On July 22, 2023, Mother was arrested for driving under the influence, driving without a license, and exhibiting a deadly weapon. On this same date, Father was arrested for corporal injury on a spouse.

The contested jurisdictional/dispositional hearing on the section 387 petition was held on August 10, 2023. The juvenile court found true the allegations in the section 387 petition, continued the children as dependents of the court, terminated Mother's reunification services, and set a section 366.26 hearing. The children were maintained in MGM's home and Mother was provided with supervised visits for two hours per week. Father was provided with supervised visits once a month for one hour.

The girls had been residing in the home of the maternal grandparents since June 28, 2023. They were also in their care from October 12, 2022, to April 28, 2023. They appeared to be well-adjusted and had strong attachments with their maternal grandparents and maternal aunts who lived in the home. The maternal aunts are 18 and 12 years old, and the girls called them their "'sisters.'" The girls were meeting their developmental, educational, and emotional milestones.

Since services were terminated, Mother had been consistent with her visits with the children. She had been appropriate and the visits had gone well. A. and Y. shared that they enjoyed spending time with their mother and that the visits were going well. The girls did not struggle with saying goodbye to Mother and transitioned well to ending

the visits as they are bonded with their grandparents/caregivers. Father had not been consistent with visits. He last visited the children on April 24, 2023. Although the visits went well and Father was appropriate with the girls, M. was hesitant to interact with Father and did not appear to have a bond with him. Y. and A. had adjusted to not seeing Father and appeared to have a limited bond with him. The girls did not struggle with saying goodbye to Father.

The maternal grandparents, Mr. and Mrs. O., desired to adopt the girls and give them stability and permanency. Y., who was six years old at the time, stated that she wanted to be adopted by her grandparents and stay with her sisters and grandparents because she "'loves them'" all. Y. also indicated that she felt safe in her grandparents' home and denied having any worries. A., who was five years old at the time, also stated "'yes'" when asked if she wanted to be adopted by her grandparents. She indicated that she knew what adoption meant, noting she gets to stay in the home with her grandparents "'forever,'" and that she felt safe in the home.

In January 2024, CFS reported that A. and Y. consistently voiced their desire to stay with their maternal grandparents and be adopted. They appeared to have an understanding of adoption and shared they wanted to stay in the home. CFS believed it was in the children's best interest to remain together as a sibling set and in a relative home where they appeared to be securely bonded to their caregivers. CFS noted that at each home visit, M. appeared to be physically and emotionally attached to MGM as she

13

stayed near her, hugging her for comfort. A. and Y. also appeared to have a loving and close relationship with each other as well as their maternal grandparents.

On January 9, 2024, Mother filed a section 388 petition to change the court's prior order terminating her services. She alleged there was a change in circumstance since the juvenile court terminated her services, which included her participation in a parenting program and completion of individual counseling and a drug treatment program. Based on this change in circumstance, Mother requested the court reinstate reunification services and liberalize her visits. She claimed this new order was in the children's best interests due to her strong bond with them and her consistent contact with them. She provided letters showing she was enrolled in services and pay stubs showing her employment.

CFS recommended the juvenile court deny Mother's section 388 petition. Mother stated that she felt ready to have the children back as she had made life changes, such as obtaining employment, housing, and completing some services. Mother provided a letter of completion for individual counseling where she completed eight sessions. She also provided a certificate of completion for outpatient drug treatment dated November 27, 2023. However, Mother stated that she had no random drug tests that could be provided to the court to evidence her sobriety. Nevertheless, Mother stated that she did not use drugs or drink alcohol. When asked where she lived, Mother stated she lived in Los Angeles and was renting an apartment with family. When CFS inquired further, Mother asserted that she lived with Father. She further reported that she was currently seven

14

months pregnant and that Father was the biological father of her unborn child. Mother reported Father did not drink or use substances, that he had employment, that she and Father did not have disagreements or fights, and that the relationship was going well. CFS noted Mother appeared to not benefit from her domestic violence program as evidenced by her continued relationship with Father, and her substance abuse program as evidenced by her driving under the influence arrest in July 2023.

On February 14, 2024, the juvenile court held an evidentiary hearing on Mother's section 388 petition. After considering the reports filed by CFS and arguments by the parties, the court denied Mother's request for additional services, finding no change in circumstances and not in the children's best interests.

On April 8, 2024, CFS reported that Mother continued to visit with the children once a week for two hours. Mother had been consistent with her visitations, arrived on time, and stayed for two hours. According to MGM, the children were happy to see Mother, the visits went well, and that when the two hours were over the children were able to say goodbye. MGM noted that at times the children expressed wanting to go with Mother. Father continued to be incarcerated and did not have visits with the children.

On April 9, 2024, the date set for the section 366.26 hearing, Mother filed another section 388 petition, requesting reunification services be reinstated. The court denied the petition.

The court thereafter proceeded to the contested section 366.26 hearing. The parents objected to the termination of parental rights and asked the court to consider legal

15

guardianship. Mother testified on her own behalf. She stated that she had consistently been visiting the children at MGM's home once a week for two hours and special holiday visits. During the visits, Mother engaged with the children by practicing their math and sight words, playing games with them, and cooking and baking with them. The children called her "mommy" and MGM "mama" and were excited to see her. Mother also stated that she would bring learning and reading books to the visits, as well as toys, food, clothes, and shoes.

After hearing from counsel, the juvenile court found Father had not met any of the factors outlined in *Caden C.*, *supra*, 11 Cal.5th 614. As to Mother, the court found Mother met the first prong of the parent-child relationship exception by having regular visitation and contact with the children. However, Mother did not meet the second and third prongs of those factors. The court explained the children did not struggle at the end of their visits with Mother and did not have the substantial, positive emotional attachment needed to overcome the preference for adoption. The court also found that even if there was a bond between Mother and the children, "it's clear to the [c]ourt that it would not cause great harm or be detrimental to any of the children if [it] were to sever parental rights." The court thus concluded Mother failed to meet her burden in establishing the parental beneficial exception to termination of parental rights applied. The court found the children to be adoptable and terminated the parents' parental rights. The parents timely appealed.

III.

DISCUSSION

Mother contends the juvenile court erred by finding the parents failed to establish the parental benefit exception to adoption did not apply. Father joins Mother's argument, and asserts if Mother's parental rights are reversed, the same result should apply to him.

A. *Legal Principles*

"To guide the court in selecting the most suitable permanent arrangement" for a dependent child "who cannot be returned to a parent's care," section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629-630; see § 366.26, subd. (b); *In re A.L.* (2022) 73 Cal.App.5th 1131, 1149.) If the court finds that the child "is likely to be adopted" and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption." (*Caden C.*, *supra*, at p. 630; see § 366.26, subd. (c)(1); *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A); *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.)

One of those reasons, the parental benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3)

17

"terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i); *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206.) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, at p. 632; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 316.)

To establish the second element, that the child would benefit from continuing the parental relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 854 (*J.D.*).) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, at p. 632; see *J.D.*, *supra*, at p. 854.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, at p. 632; see *In re J.D.*, *supra*, at p. 854.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 317.) "When it weighs whether

18

termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). . . . Accordingly, courts should not look to whether the parent can provide a home for the child." (*Caden C.*, *supra*, at p. 634; see *Katherine J.*, *supra*, at p. 317.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, at pp. 633-634, italics omitted; see *Katherine J.*, *supra*, at p. 317.)

B. *Standards of Review*

A "substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; see *Katherine J.*, *supra*, 75 Cal.App.5th at pp. 317-318; *In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. . . . [¶] Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court

19

makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 318; *In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

C. *Analysis*

In this case, at the section 366.26 hearing, the juvenile court expressly conducted the analysis under *Caden C.* on the record before finding the exception inapplicable. We find that the juvenile court did not err in finding the parental benefit exception did not apply.

We agree with the juvenile court that Father failed to establish any of the factors outlined in *Caden C.* We also agree with the juvenile court that Mother had established she maintained regular visitation and contact with the children. The record indicates that Mother consistently visited the children, especially after her services were terminated, but not in the first six months of the dependency. The record shows Mother maintained consistent contact with the children from August 2023 to April 2024.

In any event, Mother, who had the burden of proving the applicability of the parental benefit exception (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 635), did not introduce any evidence the children had a substantial, positive, and emotional attachment to her. (Compare *In re D.M.* (2021) 71 Cal.App.5th 261, 271 [the

father testified that the children wanted to return to him and that the youngest child cried when their visits concluded]; *J.D.*, *supra*, 70 Cal.App.5th at p. 856 [the mother introduced logs of her virtual visits with her son that detailed the depth of their bond].)

Nor was there any evidence suggesting the children had such an attachment. While the children were happy to see Mother, they did not cry when the visits ended and easily said goodbye to Mother at the end of visits. (Compare *In re B.D.*, *supra*, 66 Cal.App.5th at p. 1229, fn. 4 [evidence of the way the children greeted their parents with hugs and expressed sadness at the end of visits suggested the parents had a "beneficial relationship" with their children].) To the contrary, the evidence showed a relationship that, at times, may have been harmful to the children. While in her custody, Mother engaged in substance abuse and repeated incidents of domestic violence with Father. In addition, while in Mother's care, Mother often neglected the children's needs and left the home for days at a time without informing MGM of her whereabouts. And when she did return, Mother appeared to be under the influence, had bruises on her face, and fought with MGM to take the children. These episodes could not have been a positive experience for the children. (See *Caden C.*, *supra*, at p. 637 ["A parent's struggles may mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child."]; *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1159 [evidence the father's prior substance abuse had a negative impact on the child "was germane to the court's assessment of '"the strength and quality"' of the parent-child relationship"].)

21

The children were removed from Mother on two separate occasions. When they were initially removed from parental custody on March 7, 2021, Y. was four years old and A. was two years old. M. was a newborn when she was initially removed from the parents on March 11, 2022. The girls were returned to Mother's custody on in April 2023, but removed once again about three months later in July 2023. By the time of the section 366.26 hearing on April 9, 2024, Y. was six years old, A. was four years old, and M. was two years old. They had spent most of their young lives out of Mother's custody. The children required stability and security for longer periods of time than merely months, something Mother was unable to provide given her history with substance abuse and inability to leave Father who continued to abuse her. Meanwhile, the maternal grandparents provided love, care, permanency, stability, and security to the girls who were thriving in their home.

Finally, for the third element, the court considers whether the termination of parental rights would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) In determining whether termination would be detrimental, "the question is . . . whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child

22

would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.)

Nothing in the record suggests the children would be detrimentally affected by having Mother's rights terminated and being adopted by their maternal grandparents. Rather, the record indicates it would be detrimental for the girls to return to Mother's care as evidenced by her failure to benefit from the services she received and continuing to live with Father. Mother had allowed Father to have unsupervised contact with the children, and as recently as February 2024, Mother reported that she lived with Father and was seven months pregnant with Father's unborn child. The girls were bonded to their maternal grandparents, who had been providing them with ongoing care and love since their birth, and had strong, positive attachments to them. Y. and A. had verbalized their love for the maternal grandparents and wanted their maternal grandparents to adopt them. They understood what it meant to be adopted and consistently voiced their desire to remain with the maternal grandparents. Although M. was non-verbal, she was observed to be physically and emotionally attached to MGM. M. stayed near MGM and hugged her for comfort. Indeed, due to their maternal grandparents' commitment, the girls were thriving in their home. The stability, security, and sense of belonging the girls felt in MGM's home was evidenced by Y. and A.'s verbal expression of who they wanted to live with and where they wanted to live. The evidence in the record is clear that the children will not suffer any detriment from the termination of parental rights. The

juvenile court did not abuse its discretion in finding the parental benefit exception did not apply.

## IV.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON _____

J.

We concur:

RAMIREZ _____

P. J.

MILLER _____

J.